

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-16-2001

# Green v. Fund Asset Mgt

Precedential or Non-Precedential:

Docket 99-5734

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Green v. Fund Asset Mgt" (2001). *2001 Decisions.* Paper 51.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/51

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 16, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-5734

JACK GREEN, individually and as Trustee;
LAWRENCE P. BELDEN, Trustee;
STANLEY SIMON, Trustee

v.

FUND ASSET MANAGEMENT, L.P.;
MERRILL LYNCH ASSET MANAGEMENT, L.P .;
MERRILL LYNCH & CO., INC.;
MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED;
PRINCETON SERVICES, INC.; ARTHUR ZEIKEL;
TERRY K. GLENN; MUNIENHANCED FUND, INC.;
MUNIVEST FUND II INC.; MUNIYIELD FUND, INC.;
MUNIYIELD INSURED FUND, INC.;
MUNIYIELD INSURED FUND II, INC.;
MUNIYIELD QUALITY FUND, INC.;
MUNIYIELD QUALITY FUND II, INC.

Jack Green,
Lawrence P. Belden,
Stanley Simon,

Appellants

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 97-cv-03502)
District Judge: Honorable Dickinson R. Debevoise

Argued on June 27, 2000

Before: ROTH and GARTH, Circuit Judges,
and STANTON,* District Judge

(Opinion filed: March 16, 2001)

        Bruce I. Goldstein, Esquire
        Alberto G. Santos, Esquire
        Saiber, Schlesinger, Satz & Goldstein
        One Gateway Center
        Suite 1300
        Newark, NJ 07102-5311

        Lawrence M. Johnson, Esquire
         (Argued)
        Mahoney, Hawkes & Goldings
        75 Park Plaza
        The Heritage on the Garden
        Boston, MA 02116

         Attorneys for Appellants

        Alan S. Naar, Esquire
        Paul A. Rowe, Esquire
        Greenbaum, Rowe, Smith, Ravin,
         Davis & Himmel LLP
        P.O. Box 5600
        Woodbridge, NJ 07095

         Attorneys for Appellees-Defendants
Fund Asset Management, L.P.,
Merrill Lynch Asset Management,
L.P., Merrill Lynch & Co., Inc.,
Merrill Lynch, Pierce, Fenner &
Smith Incorporated, Princeton
Services, Inc., Arthur Zeikel and
Terry K. Glenn

_____

* Honorable Louis L. Stanton, District Court Judge for the Southern
District of New York, sitting by designation.

James N. Benedict, Esquire (Argued)
Mark Holland, Esquire
James F. Moyle, Esquire
Sean M. Murphy, Esquire
Danielle A. Prill, Esquire
Clifford Chance Rogers & Wells LLP
200 Park Avenue
New York, NY 10166

 Attorneys for Appellees
Fund Asset Management, L.P.,
Merrill Lynch Asset Management,
L.P., Merrill Lynch & Co., Inc.,
Merrill Lynch, Pierce, Fenner &
Smith Incorporated, Princeton
Services, Inc., Arthur Zeikel and
Terry K. Glenn

Robert J. Del Tufo, Esquire
Frank E. Derby, Esquire
Skadden, Arps, Slate, Meagher &
 Flom LLP
One Newark Center, 18th Floor
Newark, NJ 07102

 Attorneys for Appellees
MuniEnhanced Fund, Inc.,
MuniVest Fund II, Inc., MuniYield
Fund, Inc., MuniYield Insured
Fund, Inc., MuniYield Insured
Fund II, Inc., MuniYield Quality
Fund, Inc., and MuniYield Quality
Fund II, Inc.

OPINION OF THE COURT

ROTH, Circuit Judge:

The plaintiffs, shareholders in several investment companies, filed an interlocutory appeal of the District Court's dismissal of their state law claims for br each of fiduciary duty and deceit. They claim that the District Court erred in concluding that these claims ar e preempted

3

by S 36(b) of the Investment Company Act of 1940, as amended (ICA). Because we conclude that the claims are not preempted, we will reverse their dismissal and remand this case to the District Court.

## I. FACTS[1]

The plaintiffs are shareholders in seven investment companies, the named defendants in this action: MuniEnhanced Fund, Inc., MuniVest Fund II, Inc., MuniYield Fund, Inc., MuniYield Insur ed Fund, Inc., MuniYield Insured Fund II, Inc., MuniY ield Quality Fund, Inc., and MuniYield Quality Fund II, Inc. (the Funds). The plaintiffs invested more than $44,000 in the Funds between May 22 and October 18, 1995. The named plaintif f, Jack Green, has brought suit individually and in his capacity as a trustee of seven trusts that invested in the Funds. The other plaintiffs, Lawrence P. Belden and Stanley Simon, sue solely as trustees of trusts that invested in the Funds. Although not named in the caption, the complaint also identifies as plaintiffs seven trusts that allegedly purchased shares of the Funds. The plaintiffs have brought the case as a putative class action, seeking to repr esent more than 100,000 investors in the Funds.

The Funds are closed-end investment companies, which are registered with the Securities and Exchange Commission (SEC) and publicly traded on the New Y ork Stock Exchange. All of the Funds are incorporated under the laws of Maryland and have their principal places of business in Plainsboro, New Jersey. By investing in long-term tax-exempt municipal bonds, the Funds' aim is to provide shareholders with income that is exempt from federal income taxes and to increase retur n to shareholders through the use of leverage. The Funds gain leverage by issuing shares of preferred stock that pay dividends based upon prevailing short-term interest rates and investing the proceeds from the sale of this preferred stock in longer-

_____

1. Because the facts of this case are not in dispute, the factual background that follows is taken largely from an earlier District Court opinion in this case. See Green v. Fund Asset Management, 19 F. Supp. 2d 227 (D.N.J. 1998).

4

term obligations that, under normal market conditions, pay higher rates. As long as there is a spr ead between the short-term rates paid by the Funds to holders of the preferred stock and the longer-ter m rates received by the Funds from investments, the fund managers ar e able to provide the shareholders with higher yields.

Defendant Fund Asset Management, L.P., (F AM) serves as the Funds' investment adviser and is responsible for managing the Funds' investment portfolios and pr oviding administrative services to the Funds. Pursuant to written investment advisory agreements, the Funds pay F AM a fee for its services based upon a percentage of the Funds' weekly net assets. The MuniEnhanced Fund, Inc., prospectus describes its advisory fee as follows:

> For the services provided by the Investment Adviser [FAM] under the Investment Advisory Agr eement, the Fund will pay a monthly fee at an annual rate of .50 of 1% of the Fund's average weekly net assets (i.e. , the average weekly value of the total assets of the Fund, minus the sum of accrued liabilities of the Fund and accumulated dividends on the shares of pr eferred stock). For purposes of this calculation, average weekly net assets is determined at the end of each month on the basis of the average net assets of the Fund for each week during the month.

Green v. Fund Asset Management, 19 F . Supp. 2d 227, 229 (D.N.J. 1998) (Green I).2

Defendant Merrill Lynch Asset Management, L.P ., (MLAM) is an affiliate of FAM. MLAM and FAM are organized under the laws of Delaware and have their principal places of business in Plainsboro, New Jersey. Defendant Princeton Services, Inc., (PSI), a Delaware corporation with its principal place of business in Plainsboro, New Jersey, is the general partner of FAM and MLAM. PSI has a 1% interest in FAM and MLAM. Defendant Merrill Lynch and Co., Inc., is FAM's and MLAM's sole limited partner and has a 99% interest in FAM and MLAM. Merrill L ynch is a publicly

_____

2. The prospectuses for the other Funds contain virtually identical disclosures.

5

traded holding company that provides global investment, financing, insurance, and related services through its subsidiaries and affiliates. Merrill Lynch is a Delaware corporation with corporate headquarters in New Y ork City.

Defendant Arthur Zeikel is the President and a director of each of the Funds, President and Chief Investment Officer of MLAM and FAM, President and a dir ector of PSI, and an Executive Vice President of Merrill L ynch. Defendant Terry Glenn is the Executive Vice President of each of the Funds and Executive Vice President of F AM and MLAM.

Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated (MLPFS), a securities broker –dealer and investment bank, is a wholly owned subsidiary of Merrill Lynch. MLPFS served as the principal underwriter for the offerings of the Funds' common stock. MLPFS has also entered into auction agent agreements with the Funds to sell the Funds' preferred stock. The 1994 MuniYield Insured Fund, Inc., annual statement describes the fees generated by the preferred stock auctions as follows:

> The Fund pays commissions to certain broker –dealers at the end of each auction at an annual rate ranging from 0.25% to 0.375%, calculated on the pr oceeds of each auction. For the year ended October 31, 1994, MLPFS, an affiliate of FAMI [FAM's predecessor], received $591,736 as commissions.

Id.3 MLPFS is a Delawar e corporation and maintains its corporate headquarters in New York City.

The plaintiffs brought this action seeking to remedy alleged violations of state law and of S 36(b) of the Investment Company Act of 1940 (the ICA), codified at 15 U.S.C. S 80a–35(b).4 In their complaint, plaintiffs allege that defendants breached their disclosure obligations and fiduciary duties under the ICA and under state law. The

_____

3. Each of the Funds' annual statements contains virtually identical disclosures.

4. Plaintiffs originally filed their complaint in the United States District
Court for the District of Massachusetts on June 21, 1996. Defendants filed a motion to transfer the case to the District of New Jersey pursuant to 28 U.S.C. S 1404 and the motion for transfer was granted.

plaintiffs contend that the defendants "failed to explicitly or sufficiently disclose" that the calculation of FAM's management fee would include assets purchased with the proceeds from the sale of preferr ed stock. They claim that because the advisory fee is measured as a per centage of the Funds' capitalization, including leverage, ther e is a strong financial incentive for FAM to keep the Funds fully leveraged at all times, even when it would be in the best interest of shareholders to reduce or eliminate leverage. The plaintiffs contend that FAM would lose approximately one-third of its advisory compensation if it eliminated leverage. They argue that the fee arrangement cr eates an inherent conflict of interest, which was not disclosed in the Funds' prospectuses, the Funds' filings with the SEC, or the Funds' periodic reports to the shareholders. The plaintiffs also allege that the defendants failed to disclose that the issuing of the preferred stock was subject to a conflict of interest; they find this conflict in the fact that FAM's affiliate, MLPFS, received fees from the sale of the preferred stock. In addition, plaintiffs claim that the defendants have continually misled investors with respect to the advisory fees, which are ultimately paid by the Funds' shareholders.

The plaintiffs seek both compensatory damages and injunctive relief. They ask for an order permanently enjoining the defendants from entering into any compensation arrangement between the Funds and any investment adviser under which "the compensation payable to such investment advisor is determined by, dependent upon, or measured or influenced by, the amount of financial leverage of its common equity investment maintained by such fund." Green I, 19 F. Supp. 2d at 230 (internal quotation marks omitted).

The defendants filed a motion, pursuant to Federal Rule of Civil Procedure 12(c), to dismiss the plaintiffs' state law claims for breach of fiduciary duty and deceit. The defendants contend that the plaintiffs' state law claims are preempted by S 36(b) of the ICA, which cr eates a federal, private right of action for breach of fiduciary duty by an investment adviser or mutual fund management company with respect to payment and compensation for services. The District Court granted the defendants' motion and

dismissed the plaintiffs' state law claims. The District Court did acknowledge, however, that the question presented, i.e., whether S 36(b) of the ICA preempts the plaintiffs' state law claims for breach of fiduciary duty and deceit, was a close one and a question of first impression in the courts of appeals. For that reason, the District Court permitted the plaintiffs to file an interlocutory appeal pursuant to 28 U.S.C. S 1292(b). Green v. Fund Asset Management, 53 F. Supp. 2d 723, 731-32 (D.N.J. 1999) (Green II).

II. JURISDICTION & STANDARD OF REVIEW

The District Court had jurisdiction over the plaintiffs' federal claim under 28 U.S.C. S 1331. The District Court had jurisdiction over the plaintiffs' state law claims under 28 U.S.C. S 1367. We have jurisdiction over the plaintiffs' appeal under 28 U.S.C. S 1292(b).

We have plenary review of the District Court's order dismissing the plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(c). See, e.g., Consolidated Rail Corp. v. Portlight, Inc., 188 F.3d 93, 95-96 (3d Cir. 1999). We must "view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the . . . non-moving party." Institute for Scientific Info., Inc. v. Gordon & Breach, Science Publishers, Inc., 931 F.2d 1002, 1004 (3d Cir. 1991). We will affirm the District Court's judgment only if the plaintiffs would not be entitled to relief under any set of facts that could be proved. See Consolidated Rail Corp., 188 F.3d at 95-96.

III. DISCUSSION

The question we must answer on this appeal is as follows: Does state law (in this case, common law establishing liability for breach of fiduciary duty and deceit) stand as an obstacle to the accomplishment and execution of the full purposes and objectives which Congr ess had in mind in enacting S 36(b) of the ICA?

Defendants argue that S 36(b) of the ICA, codified at 15 U.S.C. S 80a-35(b), preempts the plaintif fs' state law claims for breach of fiduciary duty and deceit. Section 36(b) is a

8

lengthy and detailed statutory provision. It pr ovides that an investment adviser of a registered investment company has a fiduciary duty with respect to compensation for services. An action may be brought in district court by a security holder of the registered investment company against the investment adviser for breach of that fiduciary duty regarding compensation. In such an action, it is not necessary to allege or prove personal misconduct on the part of any defendant.5

_____

5. The full text of 15 U.S.C. S 80a–35(b) provides:

For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person. With r espect to any such action the following provisions shall apply:

> (1) It shall not be necessary to allege or pr ove that any defendant engaged in personal misconduct, and the plaintif f shall have the burden of proving a breach of fiduciary duty.

> (2) In any such action approval by the boar d of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, and ratification or appr oval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company, shall be given such consideration by the court as is deemed appr opriate under all the circumstances.

> (3) No such action shall be brought or maintained against any person other than the recipient of such compensation or payments, and no damages or other relief shall be granted against any person other than the recipient of such

In order to determine whether S 36(b) preempts the plaintiffs' state law claims for breach of fiduciary duty and deceit, we must first determine what pr eemption theory is applicable. Federal law preempts, and ther eby displaces, state law in three different situations: (1) "express preemption," (2) "field preemption" (which is also sometimes referred to as "implied preemption"), or (3) "conflict preemption." See, e.g., Orson, Inc. v. Miramax Film Corp., 189 F.3d 377, 381-82 (3d Cir. 1999) (en banc).

Preemption is "express" when ther e is an explicit statutory command that state law be displaced. See Morales v. Trans World Airlines, Inc. , 504 U.S. 374, 382 (1992). An example of express preemption can be found in the Employee Retirement Income Security Act of 1974 (ERISA) which states that the provisions of that Act "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. S 1144(a). See Orson, 189 F.3d at 381. Preemption is "implied," and state law may be displaced,"if federal law so

_____

compensation or payments. No award of damages shall be recoverable for any period prior to one year before the action was instituted. Any award of damages against such recipient shall be limited to the actual damages resulting from the breach of fiduciary duty and shall in no event exceed the amount of compensation or payments received from such investment company, or the security holders thereof, by such recipient.

(4) This subsection shall not apply to compensation or payments made in connection with transactions subject to section 80a-17 of this title, or rules, regulations, or or ders thereunder, or to sales loads for the acquisition of any security issued by a registered investment company.

(5) Any action pursuant to this subsection may be brought only in an appropriate district court of the United States.

(6) No finding by a court with respect to a breach of fiduciary duty under this subsection shall be made a basis (A) for a finding of a violation of this subchapter for the purposes of sections 80a-9 and 80a-48 of this title, section 78o of this title, or section 80b-3 of this title, or (B) for an injunction to pr ohibit any person from serving in any of the capacities enumerated in subsection (a) of this section.

10

thoroughly occupies a legislative field as to make reasonable the inference that Congr ess left no room for the States to supplement it." Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992) (internal quotation marks omitted). Finally, as we stated in Orson, state law may be displaced under conflict preemption principles if the state law in question presents a conflict with federal law in one of two situations: when it is impossible to comply with both the state and the federal law, or when the state law"stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Orson, 189 F.3d at 382 (quoting Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977)).

In this case, the defendants do not contend thatS 36(b) expressly preempts the plaintiffs' state law claims for breach of fiduciary duty and deceit,6 nor do they assert that S 36(b) of the ICA, or even the entire ICA itself, impliedly preempts these claims.7 The preemption theory that the

_____

6. The defendants would be precluded fr om making such an argument because neither S 36(b), nor any other section of the ICA, contains an "explicit statutory command" indicating that federal law preempts and thereby displaces state law.

7. The defendants would be precluded fr om making such an argument since it is well-settled that neither the ICA alone nor all federal securities
laws taken together occupy the field of corporate law or securities law. See, e.g., Burks v. Lasker, 441 U.S. 471, 477 (1979) (discussing the ICA and noting that while "in certain areas[the Supreme Court has] held that federal statutes authorize the federal courts to fashion a complete body of federal law, [c]orporation law . . . is not such an area"); Baker, Watts & Co. v. Miles & Stockbridge, 876 F .2d 1101, 1107 (4th Cir. 1989) (en banc) ("It is well-settled that federal law does not enjoy complete preemptive force in the field of securities[; s]tate securities laws exist in
every state, the District of Columbia, and Puerto Rico, and, `far from preempting the field,' Congress has expr essly preserved the role of the states in securities regulation.") (citations omitted). Such state securities
laws are commonly referred to in the securities industry as "Blue Skies" laws. The instant case, moreover, is distinguishable from the recent decision in Buckman Co. v. Plaintiffs' Legal Committee, No. 98-1768, 2/21/01, ___ U.S. ___ (2001), ___ S.Ct. ___ (2001), in which the Supreme Court found state common law fraud claims relating to a medical device impliedly preempted by the Medical Device Amendments to the Food, Drug and Cosmetic Act. Although the Buckman Court acknowledged that

11

defendants claim is applicable is conflict pr eemption. In doing so, the defendants do not argue that"it is impossible to comply with both the state and federal law." 8 Instead, they assert the other prong of conflict pr eemption: that state law in this case "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." The District Court was persuaded by the defendants' arguments and dismissed the claims, concluding that they were preempted byS 36(b) under the theory of "conflict preemption." W e conclude, however, that, when plaintiffs' state law claims are pr operly analyzed under the Supreme Court's "conflict pr eemption" jurisprudence, they are not preempted byS 36(b).

In arguing for conflict preemption, the defendants have attempted to analogize this case to earlier cases. However, as the District Court recognized, none of the cases they cite are controlling; the cited cases dealt with the proposition that, with respect to other sections of the ICA, S 36(b) is the exclusive remedy for grievances concerning mutual fund service fees. Green II, 53 F. Supp. 2d at 728-29 (citing numerous cases). The District Court also corr ectly noted that, while "defendants cite the unpublished decision in Batra v. Investors Research Corp., No. 89-0528-CV-W-6, 1990 WL 165242 (W.D. Mo. May 3, 1990), and a

_____

a presumption against federal preemption of a state law cause of action exists when a field is traditionally occupied by the states, the fraud action was not subject to such a presumption because the defendant manufacturer was accused of making fraudulent r epresentations to the Food and Drug Administration during the course of the product approval process. The Court held that the prevention of fraud against federal agencies cannot be regarded as a field traditionally occupied by the states. Buckman, ___ U.S. ___ at___. Unlike the plaintiffs in Buckman, the plaintiffs in the case at bar allege not fraud against a federal agency,
but rather violations of state and federal securities laws.

8. The defendants would be precluded fr om making such an argument because no direct conflict exists between state law and federal law in this case. Cf., e.g., Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 143 (1963) ("That would be the situation here if, for example, the federal orders forbade the picking and marketing of any avocado testing more than 7% oil, which the Califor nia test excluded from the State any avocado measuring less than 8% oil content.").

12

subsequent unpublished decision in a related case, Batra v. Investors Research Corp., No. 91-0190-CV -W-6, 1992 WL 280790 (W.D. Mo. Apr. 2, 1992) (" Batra II"), as authority for their preemption argument, . . . these decisions concern the exercise of pendent jurisdiction[, and n]either decision expressly holds that Section 36(b) preempts state common law remedies." Id. at 729 (citing several cases).

The plaintiffs and the defendants have also attempted to analogize this case to several Supreme Court pr eemption cases, all of which address the issue of "express preemption," not "conflict preemption," and thus are inapposite. See, e.g., Freightliner Corp. v. Myrick, 514 U.S. 280, 284 (1995); Pilot Life Ins. Co. v. Dedeaux , 481 U.S. 41, 45-48 (1987); Jones v. Rath Packing Co., 430 U.S. 519, 531-33 (1977).

We conclude that prior case law is not on point. We are left, therefore, to determine, guided by the Supreme Court's "conflict preemption" jurisprudence, whether state law, specifically common law establishing liability for breach of fiduciary duty and deceit, "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" as set forth inS 36(b) of the ICA.

The Supreme Court has held on multiple occasions that, when analyzing preemption issues, "because the States are independent Sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action." Medtronic, Inc. v. Lohr, 518 U.S. 470, 485-86 (1996). We start with an assumption that the historic police powers of the States will not be pr eempted unless that was the "clear and manifest purpose of Congress." Id. Moreover , in making our analysis, the "purpose of Congress is the ultimate touchstone in every pre-emption case." Id. (inter nal quotation marks omitted). See, e.g., Chicago & Northwestern T ransp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317-18 (1981); New York State Dep't of Soc. Servs. v. Onondaga County Dep't of Soc. Servs., 413 U.S. 405, 414-15 (1973); Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 141-43 (1963).

Thus, in deciding whether state law stands as an obstacle to the accomplishment and execution of the full

13

purposes and objectives of Congress, as set forth in S 36(b), we must focus on and attempt to discern the intent of Congress in enacting S 36(b). Further more, because S 36(b) represents congressional legislation in a field which the States have traditionally occupied[9] -- tort actions for breach of fiduciary duty and fraud -- we must, as the Court stated in Medtronic, "start with the assumption that the historic police powers of the States," in this case the power of states to hold investment company management liable for improper compensation arrangements,"were not to be superseded . . . unless that was the clear and manifest purpose of Congress." Medtr onic, 518 U.S. at 485.

In arguing that state law "stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress," and thus that the plaintiffs' state law claims "conflict" with and are pr eempted by S 36(b), the defendants rely heavily upon and quote extensively from the legislative history of S 36(b) of the ICA. Because congressional intent is "the ultimate touchstone in every pre-emption case," we will examine that legislative history to discern the intent of Congress in enacting S 36(b).

In its own review of the legislative history, the District Court found that "Congress enacted the ICA because it had concluded that the nationwide activities of investment companies called for federal regulation and, more relevant

_____

9. See, e.g., Baggett v. First National Bank, 117 F.3d 1342, 1352 (11th Cir. 1997) ("[C]auses of action for br eaches of fiduciary duties are traditionally creatures of state law, and under Cort, it would be inappropriate to infer a cause of action for such based solely on federal law."); Gruber v. Price Waterhouse, 911 F.2d 960, 962 (3d Cir. 1990) ("The complaint asserted claims pursuant to section 11 of the Securities Act of 1933, section 10(b) of the Securities Act of 1934 and rule 10b-5, and common law fraud and deceit."); Pin v. T exaco, Inc., 793 F.2d 1448, 1452 (5th Cir. 1986) ("As to Texaco, the complaint alleges nothing more than corporate mismanagement and breaches offiduciary duty that are traditionally a matter of state regulation."); Data Probe Acquisition Corp.
v. Datatab, Inc., 722 F.2d 1, 4 (2d Cir . 1983) ("The gravamen of the claim
advanced here is a breach of management'sfiduciary duty to shareholders, a matter traditionally committed to state law, which, if entertained, would unquestionably embark us on a course leading to a federal common law of fiduciary obligations.").

to the issue at hand, enacted Section 36(b) because the existing remedies for improper compensation arrangements had been ineffective." Green II , 53 F. Supp. 2d at 730. We agree with this conclusion. A careful survey of the relevant legislative history clearly and unequivocally indicates that Congress enacted S 36(b) because it deter mined that existing remedies for improper compensation arrangements were inadequate to protect mutual fund investors.

The District Court quoted the Senate Report, accompanying the final version of the 1970 Amendments, which states that "the unique structure of mutual funds has made it difficult for the courts to apply traditional fiduciary standards in considering questions concerning management fees." S. REP. NO. 91-184 (1970), reprinted in 1970 U.S.C.C.A.N. 4897, 4898 (Senate Report). Id. at 727-28. The court then added that the "Senate Report . . . noted that the provisions contained in the ICA as originally passed in 1940 concerning the regulation of management fees and other charges to the investor `did not provide any mechanism by which the fairness of management contracts could be tested in court'." Id., quoting Senate Report at 4901. The Senate Report went on to conclude that under general rules of law, advisory contracts that had been ratified by the shareholders or approved by disinterested directors could not be upset except upon a showing of "corporate waste":

> As one court put it, the fee must "Shock the conscience of the court." Such a rule may not be an impr oper one when the protections of arm's-length bar gaining are present. But in the mutual fund industry wher e, these marketplace forces are not likely to operate as effectively, your committee has decided that the standard of "corporate waste" is unduly r estrictive and recommends that it be changed. Id.

The District Court then cited the conclusion in the Senate Report that the express statutory r equirement of "reasonableness" be eliminated and a specific "fiduciary duty" be "imposed on mutual fund investment advisers with respect to management fee compensation." Green II, 53 F.Supp. 2d at 728 (citing Senate Report at 4902). The "fiduciary duty" standard would make it easier for a

15

shareholder to prevail in an action against an investment adviser who had entered into an improper or unfair compensation arrangement.10

The defendants acknowledge that Congress enacted S 36(b) and implemented the "breach offiduciary duty" standard because it concluded that the "corporate waste" standard previously applied in most states was largely ineffective in preventing improper compensation arrangements. However, neither the District Court nor the defendants point to any language, either in the legislative history of S 36(b) or in the statute itself, that suggests that Congress intended to preempt state law claims for breach of fiduciary duty or deceit when it enacted S 36(b).

Because Congress had found that the "corporate waste" standard was inadequate to meet the problem, it sought to provide mutual fund shareholders with additional protection from improper compensation arrangements. Nevertheless, the fact that the prior remedy might be less effective does not mean that it stands as an obstacle to "the accomplishment and execution of the full purpose and objective of Congress." Even though the common law is less effective than S 36(b), it may still be the remedy of choice in certain situations. The creation of a gr eater protection does not mean that the lesser protection is an obstacle if a complainant elects to employ it. Moreover , the "lesser protection," even if it is more difficult for a complainant to prove a breach of the standard of car e, may offer a greater range of targets and of remedies. Defendants have not demonstrated that Congress intended to eliminate common law access to these targets or these r emedies.

Our conclusion that S 36(b) does not pr eempt the

---

10. Inherent in the discussion of br each of fiduciary duty vs. corporate waste is the concept that stockholder ratification or disinterested director approval of an advisory contract eliminated the breach of fiduciary duty standard in an attack on the terms of the advisory contract. See, e.g., Saxe v. Brady, 184 A.2d 602 (Del. Ch. 1962) (holding that where stockholders ratified investment adviser contract, interested parties were relieved of burden of pr oving fairness of transaction; under corporate waste standard, plaintiffs had not sustained burden of establishing that fees were legally excessive.)

16

plaintiffs' state law claims is reinfor ced by cases, involving other aspects of corporate governance, which hold that the presence of a federal remedy to relieve a problem does not preclude the recourse to a common law r emedy which is directed at the same problem. An example is CTS Corp. v. Dynamics, Corp., 481 U.S. 69 (1987), a securities law/corporate law case discussing the potential pr eemptive effect of the Williams Act. In holding that the Williams Act did not preempt an Indiana state law r egulating corporate takeovers, the Court stated:

> The Indiana Act operates on the assumption, implicit in the Williams Act, that independent shar eholders faced with tender offers often are at a disadvantage. By allowing such shareholders to vote as a gr oup, the Act protects them from the coercive aspects of some tender offers. . . . In such a situation under the Indiana Act, the shareholders as a group, acting in the corporation's best interest, could reject the of fer, although individual shareholders might be inclined to accept it. The desire of the Indiana Legislature to protect shareholders of Indiana corporations from this type of coer cive offer does not conflict with the Williams Act. Rather, it furthers the federal policy of investor protection.

CTS Corp., 481 U.S. at 82–83 (emphasis added).

This conclusion can be stated in another way: The creation of a federal remedy, in the field of securities law, does not necessarily eradicate existing state law r emedies or require that the federal remedy be exclusive. See, e.g., Medtronic, Inc. v. Lohr, 518 U.S. 470, 495–501 (1996) (holding that S 360(k) of the Medical Device Amendments of 1976 does not preempt overlapping state tort law).

The defendants contend, nevertheless, that the strict limitations of S 36(b) demonstrate that the plaintiffs' state law claims should be preempted. The defendants point out that, unlike the plaintiffs' state law claims:

> (1) Section 36(b) expressly limits the parties against whom relief can be sought, see 15 U.S.C. S 80a–35(b)(3) (2000);11

_____

11. While S 36(b) authorizes suit only against the "recipient" of the alleged excessive compensation and expressly forbids bringing suit

17

(2) Section 36(b) limits the type and amount of r elief a shareholder may recover, see id.;12

(3) Section 36(b) precludes shareholders from suing for advisory fees paid more than one year prior to the filing of the complaint, see id.; 13

(4) Section 36(b) imposes upon the plaintif f the burden of proving that the investment adviser breached his or her fiduciary duty, see  15 U.S.C. S 80a-35(b)(1);14

(5) Section 36(b) requires plaintif fs to bring suit in federal district court, see 15 U.S.C. S 80a-35(b)(5);15

(6) Section 36(b) creates no cause of action for the investment fund itself--only the Securities and Exchange Commission and shareholders of the investment fund may bring suit against an investment adviser for breach of fiduciary duty;16 and

_____

against other parties, the plaintiffs in this case have sued numerous parties under state law, many of which are not"recipient[s]" (as defined by S 36(b)) of the alleged excessive compensation.

12. Plaintiffs are seeking compensatory damages with respect to their state law claims.

13. As the District Court noted, this one-year statute of limitations is significantly shorter than the corresponding six-year statute of limitations for common law breach of fiduciary duty claims brought under New Jersey law. See N.J. STAT. ANN. S 2A:14-1 (West 1999).

14. As the District Court noted, under the common law, a fiduciary who allegedly breached his or her fiduciary duty must justify his or her conduct. See, e.g., Gedes v. Anaconda Copper Mining Co., 254 U.S. 590, 599 (1921).

15. A plaintiff seeking to bring a br each of fiduciary duty claim under state law would not have to bring his claim in federal district court and indeed would be unable to bring his claim in federal district court unless jurisdiction was provided for under 28 U.S.C.S 1367 (supplemental jurisdiction) or 28 U.S.C. S 1332 (diversity jurisdiction).

16. At common law, the shareholder's suit for breach of fiduciary duty is a derivative suit; the shareholder's right to bring suit is derived from the corporation's right to bring suit.

18

(7) At least one Court of Appeals has concluded that
S 36(b) creates an equitable cause of action and
thus plaintiffs suing under S 36(b) ar e not entitled
to a jury trial, see Krinsk v. Fund Asset
Management, Inc., 875 F.2d 404, 414 (2d Cir.
1989).17

Focusing on these procedural differ ences between a
common law cause of action and one under S 36(b), the
defendants reason that the differ ences reflect Congress's
intent to preempt state law claims and, as a consequence,
demonstrate that state law "stands as an obstacle to the
accomplishment and execution of the full purpose and
objectives of Congress." If, however , procedural differences
were sufficient both to indicate congr essional intent to
preempt overlapping state law and to demonstrate that
state law "stands as an obstacle to the accomplishment and
execution of the full purpose and objectives of Congress,"
federal law would preempt overlapping state law every time
federal law did not exactly mirror all  the state law or state
laws in question. This argument finds no support in
relevant federal case law and is actually contrary to the
Supreme Court's preemption jurisprudence. See, e.g.,
Medtronic, Inc. v. Lohr, 518 U.S. 470, 495–96 (1996); Florida
Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 141–43
(1963). In short, establishing that federal law overlaps state
law is, by itself, insufficient to establish that federal law
preempts state law.

Indeed, if we were to accept the defendants' ar gument
that procedural differences both indicate congressional
intent to preempt the plaintiffs' state law claims and
demonstrate that state law "stands as an obstacle to the
accomplishment and execution of the full purpose and
objectives of Congress," then the '33 Act and the '34 Act
would also, by definition, preempt much state law in the
areas of corporate and securities law since many of the
procedural and substantive requirements of the '33 Act and
the '34 act differ markedly from the corr esponding
procedural and substantive requirements of corporate and

_____

17. Presumably, a plaintiff seeking damages for common law fraud or
deceit is entitled to a jury trial.

19

securities law in most states. However, as noted above, it is well-settled that the '33 Act and the '34 Act do not preempt overlapping state law except where the overlapping state law "stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress" or where it is impossible to comply with both state and the federal law. The '33 Act and the '34 Act are just two of many possible examples of federal laws that do not generally preempt overlapping state law. As the Supreme Court noted in Medtronic in r egard to the potential preemptive effect of S 360(k) of the Medical Device Amendments of 1976:

> Nothing in S 360(k) denies Florida the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements. Even if it may be necessary as a matter of Florida law to prove that those violations were the result of negligent conduct, or that they cr eated an unreasonable hazard for users of the pr oduct, such additional elements of the state-law cause of action would make the state requirements narr ower, not broader, than the federal requir ement. While such a narrower requirement might be"different from" the federal rules in a literal sense, such a dif ference would surely provide a strange reason for finding pre-emption of a state rule insofar as it duplicates the federal rule. The presence of a damages remedy does not amount to the additional or different "r equirement" that is necessary under the statute; rather, it mer ely provides another reason for manufacturers to comply with identical existing "requirements" under federal law.

Medtronic, 518 U.S. at 495 (emphasis added).

In this case, as in Medtronic, we ar e presented with overlapping state and federal laws that impose dif ferent procedural requirements upon plaintif fs seeking to bring suit. However, here, as in Medtr onic, state law furthers "the accomplishment and execution of the full purpose and objectives of Congress." Neither the language of S 36(b) nor the accompanying legislative history indicates, or even suggests, that the plaintiffs' state law claims stand "as an obstacle to the accomplishment and execution of the full

20

purpose and objectives of Congress."18 This fact is fatal to the defendants' preemption arguments, especially in light of the presumption against preemption in situations where Congress has "legislated . . . in a field which the States have traditionally occupied." See, e.g., Medtronic, 518 U.S. at 484–86.

While the defendants argue that the pr ocedural differences in question both indicate congressional intent to preempt the plaintiffs' state law claims and demonstrate that state law in this case "stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress," we find it mor e likely that these differences demonstrate a congressional attempt to limit the relief available to plaintiffs underS 36(b). In enacting S 36(b) in 1970, Congress not only created a federal, private right of action previously unavailable under federal law, Congress also radically altered the legal standard under which the fairness and corresponding legality of mutual fund compensation arrangements had been evaluated. Consistent with Congress's intent in enactingS 36(b), the legal standard under which mutual fund compensation arrangements are evaluated under S 36(b) is markedly more "plaintiff-friendly" than the "corporate waste" standard applied by most state courts prior to 1970. In or der to temper the radical change in the legal standar d under which the fairness and corresponding legality of mutual fund compensation agreements would be evaluated under S 36(b), Congress instituted various pr ocedural limitations. These procedural limitations are the same procedural differences highlighted by the defendants as evidence that state law in this case "stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress."

_____

18. Defendants argue in their brief that the ICA generally and S 36(b) specifically demonstrate a "Congressional desire to replace . . . ineffective
state laws with a `national' uniform  standard." Brief for Appellees at 13 (emphasis added). As a threshold matter , we note that the defendants have cited no authority that indicates or even suggests that a desire for uniformity alone gives rise to "conflict preemption" of state law by federal
law.

21

Although the defendants argue to the contrary, we conclude that these procedural differ ences and limitations do not indicate that state law in this case "stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress," but rather show that Congress realized that S 36(b)'s sweeping change in the legal standard, under which the fairness of mutual fund compensation agreements would be evaluated, necessitated corresponding limitations in the relief available.

In addition, we note that the defendants' reliance on recent the Supreme Court preemption decisions in United States v. Locke, 120 S. Ct. 1135 (2000), Geier v. American Honda Motor Co., 120 S. Ct. 1913 (2000), Nor folk Southern Ry. v. Shanklin, 120 S. Ct. 1467, 1477 (2000), and Crosby v. National Foreign Trade Council, 2000 WL 775550 (June 19, 2000) is misplaced. The Supreme Court's holding in Locke that Title II of the Ports and W aterways Safety Act (PWSA) preempts conflicting state law was based primarily on the doctrine of stare decisis. Many of the issues raised in Locke were raised, analyzed and addr essed by the Supreme Court in Ray v. Atlantic Richfield Co., 435 U.S. 151 (1978). To the extent that the subsequent enactment of the Oil Pollution Act (OPA) modified or amended the Ports and Waterways Safety Act, the relevant statutory history explicitly states that the OPA "does not disturb the Supreme Court's decision in Ray v. Atlantic Richfield Co., 435 U.S. 151 (1978)." Locke, 120 S. Ct. at 1147 (quoting H.R. CON. REP. NO. 101–653, at 122 (1990)). More importantly, Locke is distinguishable fr om the case now before us because Congress, in enacting the OPA and PWSA, did not "legislate[ ] . . . in afield which the States have traditionally occupied." Thus, the pr esumption against preemption present in this case did not exist in Locke. Locke, 120 S. Ct. at 1147–48.

In Geier, the Supreme Court held that the petitioners' state tort claim, based on a lack of an automobile airbag, conflicted with the objectives of Federal Motor V ehicle Safety Standard 208 and therefore was preempted by the National Traffic and Motor Vehicle Safety Act of 1966. See Geier, 120 S. Ct. at 1922. However, Geier, like Locke, is distinguishable from the case before us because the Court

22

in Geier relied upon federal statutory language and the corresponding legislative history, concluding that state law stood "as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress."

Similarly, the Supreme Court's recent opinions in Norfolk Southern Ry. v. Shanklin, 120 S. Ct. 1467, 1477 (2000) and Crosby v. National Foreign Trade Council, 2000 WL 775550 (June 19, 2000) are distinguishable. The Court in Norfolk held that the Federal Railroad Safety Act of 1970, in conjunction with various regulations pr omulgated under the act, preempted state law tort claims stemming from a railroad's failure to maintain adequate warning devices at crossings where federal funds were used to install such warning devices. See Norfolk, 120 S. Ct. at 1474-77. However, the Supreme Court's holding in Norfolk, like its holding in Locke, was based primarily on the doctrine of stare decisis. See Norfolk, 120 S. Ct. at 1474-77; CSX Transp., Inc. v. Easterwood, 507 U.S. 658 (1993). Moreover, Norfolk addressed the issue of "express preemption," not "conflict preemption" and thus is inapposite to the case now before us.

The Court in Crosby also held that a Massachusetts law barring state entities from buying goods and services from companies doing business in Burma was pr eempted by a subsequent federal law imposing mandatory and conditional economic sanctions on Burma. In contrast to Norfolk, Crosby clearly pr esented a question of "conflict preemption." However, like Locke and Geier, Crosby is distinguishable because the Court in Crosby relied upon the language of three clear and unambiguous federal statutory provisions in concluding that state law stood "as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." In addition, in enacting the federal statutory provisions at issue in Crosby, Congress sought to affect national for eign policy: not "a field which the States have traditionally occupied." Thus, the presumption against preemption pr esent in this case did not exist in Crosby.

Finally, we note that the party claiming preemption bears the burden of demonstrating that federal law pr eempts state law. See, e.g., Silkwood v. Kerr-McGee Corp., 464 U.S.

23

238, 255 (1984); Buzzard v. Roadrunner T rucking, Inc., 966 F.2d 777, 780 (3d Cir. 1992). Her e, the defendants bear the burden of demonstrating that S 36(b) of the ICA preempts the plaintiffs' state law claims for br each of fiduciary duty and deceit. In order to prevail under a theory of "conflict preemption," the defendants must demonstrate that the state law at issue in this case "stands as an obstacle to the accomplishment and execution of the full purpose and objective of Congress" as set forth in S 36(b). Because we conclude that the defendants have failed to make this showing, we hold that the plaintiffs' state law claims are not preempted by S 36(b).

IV. CONCLUSION

In arguing that the plaintiffs' state law claims for breach of fiduciary duty and deceit are preempted by S 36(b) of the ICA, the defendants fail to point to any language, either in S 36(b) itself or in the accompanying legislative history that demonstrates that Congress intended S 36(b) to preempt, and thereby displace, the plaintiffs' state law claims. The defendants also fail to demonstrate how state law in this case "stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." We hold, therefore, that the plaintiffs' state law claims are not preempted by S 36(b). We will reverse the District Court's grant of judgment and remand this case to the District Court for further proceedings.19

_____

19. In so ruling, we note that the disposition of this appeal does not hinge on the merits of plaintiffs' state law claims. Rejection of the defendants' arguments in favor of preemption in no way suggests that the plaintiffs should ultimately prevail on the merits. We hold only that S 36(b) of the ICA does not preempt the plaintiffs' state law claims for breach of fiduciary duty and deceit.

24

STANTON, District Judge, Dissenting:

For the reasons stated in the District Court's opinion, Green v. Fund Asset Management, L.P. , 53 F.Supp.2d 723 (D.N.J. 1999) which I would affirm, I respectfully dissent.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

25